IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs December 20, 2017

## ROY LEN ROGERS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Rhea County**
**No. 16878     J. Curtis Smith, Judge**

_____

### No. E2017-00445-CCA-R3-PC

_____

The petitioner, Roy Len Rogers, appeals the denial of post-conviction relief from his 2010 Rhea County Criminal Court jury convictions of first degree premeditated murder, second degree murder, and reckless endangerment, for which he received a sentence of life imprisonment. In this appeal, the petitioner contends only that he was denied the effective assistance of counsel at trial. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

M. Keith Davis, Dunlap, Tennessee, for the appellant, Roy Len Rogers.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Michael J. Taylor, District Attorney General; and James W. Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Rhea County Grand Jury charged the petitioner with one count each of first degree premeditated murder, felony murder, and attempted first degree murder, arising out of the murder of the victim, Gregory Keith Brown, and the attempted murder of the petitioner's ex-wife, Vanessa Collett. Following a jury trial, the petitioner was convicted as charged of first degree premeditated murder and was convicted of the lesser-included offenses of second degree murder and reckless endangerment. The trial court merged the first and second degree murder convictions and imposed a mandatory life sentence, to be served concurrently with a sentence of 11 months and 29 days for the reckless endangerment conviction. This court affirmed the convictions and sentences on

direct appeal. *See State v. Roy Len Rogers*, No. E2011-02529-CCA-R3-CD (Tenn. Crim. App., Knoxville, Sept. 23, 2013), *perm. app. denied* (Tenn. Apr. 11, 2014).

The evidence adduced at the petitioner's trial established that the petitioner and Mrs. Collett met in October 2006 and married two months later. *Id.*, slip op. at 2. Because the petitioner "was very controlling and threatening from the start," the brief marriage ended in March 2007, and Mrs. Collett and her daughter, Ciera Bennett, moved in with Mrs. Collett's mother for a short time before moving into an apartment. *Id.* Following the separation, the petitioner called Mrs. Collett "sometimes . . . hundreds of [times] a day," both prior to and after Mrs. Collett had changed her telephone number, and the petitioner would often drive by Mrs. Collett's residence, even going so far as to knock on the door of Mrs. Collett's mother's residence. *Id.* Mrs. Collett eventually contacted the police, who, after numerous calls to her apartment, advised Mrs. Collett to seek an order of protection. *Id.*, slip op. at 2-3. Although Mrs. Collett did obtain an order of protection, the petitioner continued his harassment and even threatened Mrs. Collett during a telephone call, "saying that 'if he couldn't have [her,] no one else could." *Id.*, slip op. at 3.

Having met with an attorney and believing that her divorce paperwork was being processed in April, Mrs. Collett met the victim on June 8, 2007, unaware that the divorce papers were not actually filed until June 15. *Id.* When Mrs. Collett met the victim, he had already learned about her from the petitioner. *Id.* Mrs. Collett and the victim began dating, which prompted the petitioner to call and text the victim multiple times a day, demanding to know the status of the victim's relationship with Mrs. Collett. *Id.* According to Mrs. Collett, the victim instructed the petitioner to stop contacting him. *Id.*

While Mrs. Collett and the petitioner were married, Mrs. Collett was aware that the petitioner "owned quite a few guns and ammunition and would often shoot at targets in the backyard." *Id.*, slip op. at 2. Following their separation, the petitioner followed Mrs. Collett on several occasions, "including to and from church." *Id.*, slip op. at 3. Mrs. Collett had filed reports with the police to document these incidents of "stalking." *Id.*

On the evening of Saturday, July 28, 2007, Mrs. Collett and Ms. Bennett were watching television in their apartment when they heard the sound of their windchime; a domestic violence counselor had advised Mrs. Collett to place a windchime on her door to alert her to an intruder. *Id.* Mrs. Collett testified that Ms. Bennett looked through the door's peephole and stated, "'Mama, it's Len.'" *Id.* Mrs. Collett called 9-1-1 and reported a prowler but did not tell the 9-1-1 operator that the prowler was the petitioner. *Id.* When police officers arrived at her home, the petitioner was gone. *Id.*

The following morning, Mrs. Collett and Ms. Bennett attended church and returned in the evening for a second church service. *Id.* Following the evening service, the victim met Mrs. Collett at her apartment, and the pair went to dinner in Cleveland with Ms. Bennett and Ms. Bennett's boyfriend. *Id.*, slip op. at 3-4. After dinner, the foursome visited Mrs. Collett's son. *Id.*, slip op. at 4. During these events, the petitioner called the victim's cellular telephone "three or four times," but the victim ignored the calls. *Id.* After returning Ms. Bennett's boyfriend to his residence, the trio returned to Mrs. Collett's apartment between 11:15 and 11:30 p.m. *Id.*

> The victim, an electrician, was leaving to go out of town the next day, so he had packed a suitcase. He had previously decided to spend the night with Mrs. [Collett] because he was "worried with everything going on[.]" Mrs. [Collett] went into the bedroom to show the victim where to put his suitcase and to help him pick out his clothes for the following day. The victim's .380 handgun, which was holstered, was lying on a bedroom chair at that time. The victim had brought the handgun to give to Mrs. [Collett] for her protection. While Mrs. [Collett] was standing beside the victim in her bedroom, she heard a "pop" and "felt . . . a burning on [her] left hand and the side of [her] face." She saw blood drip onto the victim's hand, and the victim fell to the floor. Upon realizing that the victim had been shot, she ran to her daughter's room to get the phone in order to call 911. Mrs. [Collett] initially reported that the victim had shot himself.

> Mrs. [Collett] testified that the [petitioner] had threatened to kill her at least twice, that he had said to Mrs. [Collett's] sister that Mrs. [Collett] "was as good as dead," and that in the past, he had threatened Mrs. [Collett] with a gun. According to Mrs. [Collett], the [petitioner] did not call her anymore after the victim had been shot.

> Ms. Bennett, [who was] eighteen at the time of trial, confirmed the many incidents of stalking, harassment, and repetitive phone calls by the [petitioner] against her mother. Ms. Bennett also heard some of the threats the [petitioner] made to her mother. According to Ms. Bennett, the [petitioner] would call and say, "Dead"; her mother would

then ask, "What are you saying?"; and the [petitioner] would respond, "D-E-A-D." The [petitioner] also called Ms. Bennett's phone on a number of occasions, prompting her to change her number. Ms. Bennett confirmed that she saw the [petitioner] outside their apartment on the night before the shooting when alerted by the windchimes.

*Id.*, slip op. at 4 (internal footnote omitted).

Mrs. Collett's mother testified that, during the time in which Mrs. Collett and Ms. Bennett were living with her following the separation, the petitioner, on at least eight occasions, would "wake her up every morning by ringing the doorbell and leaving notes on the door," that she had to disconnect her home telephone because of the petitioner's incessant calls, and that the petitioner would "follow them while they were out." *Id.*, slip op. at 4-5. Mrs. Collett's sister, Dottie Hawkins, testified that the petitioner had once contacted her to inform her that he "was on his way to kill" Mrs. Collett. *Id.*, slip op. at 5. Ms. Hawkins immediately contacted the police, and police officers responded to Mrs. Collett's residence and escorted her from the apartment. *Id.* Ms. Hawkins testified that she resembled Mrs. Collett and that she had once borrowed her vehicle. *Id.* While driving Mrs. Collett's vehicle, the petitioner attempted to run her off the road, apparently mistaking Ms. Hawkins for Mrs. Collett. *Id.* Ms. Hawkins testified that the petitioner had once threatened to "use" a weapon he was holding on her and that the petitioner once told her "that he wanted her dead because she 'looked like' her sister." *Id.* Ms. Hawkins estimated that the petitioner had contacted her between 100 to 150 times to make threats against Mrs. Collett and that the petitioner had also threatened the life of Ms. Bennett. *Id.* Ms. Hawkins testified that she was married to Terry Janow and that she and her husband were in bed asleep at the time of the shooting. *Id.* Mrs. Collett's friend, Janice Franklin, testified about five or six instances when the petitioner had stalked them while they were together, including an instance when the petitioner had followed them from church. *Id.* Ms. Franklin was also present with Mrs. Collett on three or four occasions in which the petitioner called Mrs. Collett. *Id.*

Rhea County Sheriff's Department ("RCSD") Detective Chris Hall discovered a bullet hole in Mrs. Collett's bedroom window and a nine-millimeter shell casing on the ground outside the window. *Id.* Due to a gap in the window covering, Detective Hall had an unobstructed view into Mrs. Collett's bedroom from outside. *Id.* Detective Hall also noticed an area near the window where "moss 'was mashed down'" in a way that indicated "'that someone had been standing right there at the edge of the window.'" *Id.*, slip op. at 5-6. Approximately 100 feet from Ms. Collett's apartment building, Detective Hall located a set of tire tracks with "three visible longitudinal stripes" and "'fresh skid marks' where it appeared that the 'vehicle had dragged the

- 4 -

underside, . . . like the vehicle had backed out, or came out and bottomed out.'" *Id.*, slip op. at 6. Detective Hall testified that insufficient detail in the tracks rendered a positive identification of the vehicle impossible. *Id.*

RCSD Deputy Gerald Brewer measured the distance between Mrs. Collett's apartment and the petitioner's residence as between 7.9 and 8.1 miles depending on the route taken. *Id.*, slip op. at 5. When Deputy Brewer drove the most direct route at the posted speed limit, it took him approximately 10 minutes, but by increasing his speed to 10 to 15 miles per hour over the speed limit, he was able to make the drive in approximately seven minutes. *Id.*

In the early morning hours of July 30, the defendant was brought in for questioning by Tennessee Bureau of Investigation ("TBI") Special Agent Luke Muhonen. *Id.*, slip op. at 6. The petitioner told Agent Muhonen that he had previously arranged for his children to stay overnight with his parents because his air conditioning unit was broken. *Id.* The petitioner asked to speak with an attorney, and the interview ceased at that time. *Id.*

During a search of the petitioner's property following the execution of a search warrant, officers located two nine-millimeter shell casings. *Id.*, slip op. at 6. TBI testing on those shell casings as well as the shell casing found at the scene revealed that all were fired from the same firearm, were manufactred by Winchester, and were nine-millimeter Luger cartridge cases. *Id.*, slip op. at 7.

> The bullet which killed the victim was determined to be of 9mm caliber. Among the many brands that could have fired the bullet recovered from the victim's body was a Star-manufactured weapon. There was also testimony presented about an audit of the Soddy Daisy Pawn Shop, where the [petitioner] had worked from August 2006 until April 2007. While working there, the [petitioner] was often alone in the store. The pawnshop was audited for a period of September 3, 2007, to September 2, 2008. During this audit, it was discovered that a 9mm firearm, a Star Super brand, was missing. The weapon was received by the pawn shop on March 26, 2007, and the [petitioner] was the employee who processed that transaction. The police later placed a hold on the weapon on April 25, 2007, meaning that the item was not for resale. The [petitioner] would have been the employee to notate the hold on the firearm in the computer system.

*Id.*

Officers searched the petitioner's vehicles on the property and discovered the following:

> Inside a Dodge Durango, officers confiscated a camera and, on that camera, found pictures taken on July 12, 2007, of Mrs. [Collett's] apartment with two vehicles parked out front. The [petitioner's] 1993 Honda Civic was also taken from the property for further examination. The tires on the Civic had three longitudinal stripes, similar to the ones found on the scene at the nearby roadbed. There were also several "fresh scrape marks" on the undercarriage of the Civic. The marks on the vehicle were determined to be "fresh" because they were "real bright" and "[t]he metal was shining through[.]"

*Id.*, slip op. at 6. With respect to the petitioner's telephone activity on the day of and the morning after the shooting, the State introduced the following evidence:

> After learning of the shooting, the [petitioner's] brother, Russell Rogers, then an RCSD officer, called the [petitioner] on his cell phone at 12:05 a.m. but received no answer. Given the initial report of a suicide or accidental shooting at Mrs. [Collett's] apartment, Mr. [Rogers] was afraid [the petitioner] was involved. [Mr. Rogers] then called his parent[s'] house at 12:09 a.m., located next door to the [petitioner's], and they informed [Mr. Rogers] that the [petitioner] "was at his house." [Mr. Rogers] called the [petitioner's] house at 12:10 a.m. but still the [petitioner] did not answer. The [petitioner] returned [Mr. Rogers'] call, using his cell phone, at 12:12 a.m.
>
> Daniel Witherow testified that the [petitioner] called him from his cell phone at 12:09 a.m. and that they talked for two or three minutes. According to Witherow, the [petitioner] called him a second time from the [petitioner's] home phone at 12:16 [a.m.], again talking for two or three minutes "at the most." During that first call from the [petitioner's] cell phone, Witherow said he could hear an oscillating fan that the [petitioner] usually kept running in his bedroom, leading Witherow to conclude that the [petitioner]

was at home during the call. He also recalled the [petitioner's] home phone ringing in the background.

> In addition to the [petitioner's] home phone, two cell phones were linked to the [petitioner], although the [petitioner] later disputed that one of the cell phones belonged to him. It was determined that between 9:08 a.m. and 10:05 p.m. on July 29, 2007, the [petitioner] called the victim's cell phone fifteen times. The last outgoing call from the [petitioner's] cell phone was made at 11:08 p.m., and the next incoming call was from his brother Russell after midnight. The [petitioner's] home phone records reflected an outgoing call at 11:20 p.m., and the next call was made at 12:16 a.m. to Witherow. The third, disputed cell phone showed an outgoing call at 10:08 p.m. and then not another call until 1:03 a.m.

*Id.*, slip op. at 6-7 (internal footnote omitted).

Detective Hall and Agent Muhonen interviewed Mr. Janow in relation to the shooting and searched his home and vehicles. *Id.*, slip op. at 8. Detective Hall testified that Mr. Janow was not a suspect, that he was interviewed "to 'clarify some stuff,'" and that the search of his home and vehicles revealed no connection to the victim's murder. *Id.*

The petitioner testified and denied any involvement in the shooting, ever threatening Mrs. Collett, or taking the firearm from the pawn shop. *Id.* The petitioner denied ownership of one of the cellular telephones and insisted that his "conversations with the victim were cordial." *Id.* With respect to his telephone call to the victim on the day of the shooting, the petitioner claimed that he had called the victim "because the victim had called him first," and he was merely returning the victim's call. *Id.* During his second telephone conversation with Mr. Witherow in the early morning hours of July 30, the petitioner "was aware of the shooting" at Mrs. Collett's residence and, concerned that he might be questioned about the shooting, told Mr. Witherow "that he was going to write down the times of the phone calls." *Id.* Mr. Witherow told the petitioner "that 'he would save the calls and lock them on this phone so they were there.'" *Id.*

The petitioner explained that the nine-millimeter shell casings found in his home were due to a visit from Mr. Janow in which the latter had attempted to sell him a nine-millimeter handgun. *Id.* Although, according to the petitioner, he and Mr. Janow had "fired the weapon outside a few times to test it," he did not purchase the handgun.

*Id.* The petitioner also testified that, prior to his making the acquaintance of Mrs. Collett, she and Mr. Janow had engaged in an affair. *Id.*

The petitioner's father testified that, although the petitioner "'couldn't hit the broad side of a barn with a handgun[,]'" the petitioner "was extremely accurate with a '[l]ong gun' because he 'was in the ROTC rifle team,'" and he confirmed that Mr. Janow had visited the petitioner's house in an attempt to sell him a nine-millimeter handgun. *Id.* The petitioner's brother, Mr. Rogers, testified that the petitioner "was 'not very [good] at all' with a handgun" and that the petitioner "did not have a reputation for violence." *Id.* Mr. Witherow testified that, during his telephone conversation with the petitioner immediately after the shooting, the petitioner "sounded 'normal' and did not sound 'upset, or nervous, or worried.'" *Id.*

In its rebuttal proof, the State called one of the petitioner's former employees, Karen Zimmerley, who testified that she once heard the petitioner threaten to kill his former wife, Holly Peak. *Id.* Ms. Peak testified that she was the mother of the petitioner's children and that the petitioner once told her "that 'if he couldn't have [her], nobody could.'" *Id.*, slip op. at 8-9. Ms. Peak stated that, following her separation from the petitioner, he would frequently drive by her home and would call her "incessantly." *Id.*, slip op. at 9. Ms. Peak testified that she had obtained an order of protection against the petitioner. *Id.* Mrs. Collett was recalled to the stand and "denied ever having an affair with Terry Janow." *Id.*

On July 14, 2014, the petitioner filed, pro se, a timely petition for post-conviction relief, alleging, *inter alia*, that he was deprived of the effective assistance of trial counsel. Following the appointment of counsel, the post-conviction court conducted an evidentiary hearing on November 3, 2016.

At the evidentiary hearing, trial counsel testified that he had practiced law for 15 years and that, although his current practice focused on medical malpractice and municipality defense, he handled criminal matters and taught criminal justice classes. Trial counsel confirmed that he had been appointed to represent the petitioner and that the petitioner's was his second or third homicide case.

Trial counsel focused "pretty extensively" during his closing argument on the lack of any eyewitnesses to the shooting, and counsel confirmed that the petitioner had never confessed, that the murder weapon had never been found, and that there were no fingerprints or DNA matching that of the petitioner at the crime scene. Trial counsel agreed that the State's case was primarily based on the testimony of Mrs. Collett, the three bullet casings, and the nine-millimeter handgun that was missing from the petitioner's pawn shop, as well as the tire marks and undercarriage scrapes on the

petitioner's vehicle. Trial counsel admitted that he had not questioned potential jurors on the issue of domestic violence during voir dire, but he explained that he had sought suppression of all orders of protection and that he did not want to raise the specter of domestic violence by mentioning such issues to the jury prior to the start of trial.

Trial counsel conceded that he did not object to Mrs. Collett's testimony about the handgun the victim had brought her for protection, explaining that the testimony was not objectionable as hearsay because Mrs. Collett was testifying to what the victim had done rather than what he had said. Moreover, counsel was concerned that an objection would have resulted in the State's laying a foundation for the testimony and would have potentially led to Mrs. Collett expanding upon her testimony to include things counsel had sought to exclude. Trial counsel did not object or ask the court to strike Ms. Hawkins' testimony that the petitioner had threatened her with a weapon and had threatened Ms. Bennett because such statements were nonresponsive to his questions, and he believed that an objection or request to strike would have served to draw more attention to her responses. Trial counsel also thought that Ms. Hawkins' "credibility was generally poor" and that she had no evidence to support her testimony.

Trial counsel acknowledged that one of his first witnesses was Michael Gaither and that he had asked Mr. Gaither for his opinion on the petitioner's character for peacefulness. Counsel agreed that he had opened the door for the State's introduction of the petitioner's prior violent behavior, but counsel stated that he believed the State's rebuttal witnesses lacked credibility. In addition, trial counsel thought that Ms. Peak's testimony about the petitioner's behavior toward her following their separation could have been beneficial to the defense because the petitioner never "act[ed] on it."

On cross-examination, trial counsel testified that another criminal defense attorney had assisted him with the petitioner's case, both in terms of pretrial preparation and assistance at the trial itself. Trial counsel agreed that he had argued vehemently for the introduction into evidence of the audio recording of Mrs. Collett's 9-1-1 call on the evening of Saturday, July 28 but that the trial court had ruled that the audio recording was inadmissible. The trial court did, however, permit the defense to enter into evidence a written transcript of the 9-1-1 call. Although trial counsel failed to have the audio recording admitted into evidence for the purpose of identification and preservation of the issue for appeal, counsel agreed that the appellate court found the failure constituted harmless error on direct appeal.

Trial counsel believed Ms. Hawkins' credibility before the jury was so poor that "the crazier the things that she said, the better off" the case was for the petitioner. Counsel confirmed that he, along with the petitioner and their legal team, made the conscious decision to introduce the petitioner's character for peacefulness through the

testimony of the petitioner's pastor, Mr. Gaither, and the petitioner's father and brother. Until the day of trial, counsel was unaware that the petitioner had any issues with his former wife, Ms. Peak. When trial counsel cross-examined Ms. Peak, he attacked her credibility by emphasizing that she had voluntarily relinquished custody of the couple's children to the petitioner and that the petitioner had then become the children's sole caretaker.

With respect to the issue of counsel's failure to voir dire the jurors on domestic violence, counsel agreed that he had asked the jurors whether any had been accused of or had been the victim of a crime, which he believed at least covered whether any jurors had been involved in criminal charges of domestic violence. Trial counsel also stated that the defense theory "was that [the petitioner] had always said and testified at trial [that] he didn't do any of this stuff," so trial counsel did not want to address domestic violence.

Trial counsel sought suppression of the search warrant, and the trial court held "two or three hearings" on the motion, but counsel did not attack the description of the petitioner's property that was contained in the search warrant. Attached to the search warrant, which was executed by RCSD Investigator Chris Hall, were both an affidavit and an exhibit, and both documents were incorporated into the search warrant. The exhibit listed specific directions to the petitioner's property and described the petitioner's residence with particularity. Trial counsel testified that he did not believe the description of the petitioner's property to be problematic, and he knew of no grounds to attack the warrant on that basis.

The petitioner testified that he "had questions about the sufficiency of" his meetings with trial counsel. The petitioner thought that there were "some of the things [trial counsel] could have made objections to" and "some things could be stricken from the record." On cross-examination, the petitioner did not know "what [he] could have specifically told" trial counsel in additional meetings, and the petitioner admitted that trial counsel provided him with copies of his discovery materials and would answer any questions the petitioner had.

With this evidence, the post-conviction court denied relief, finding no clear and convincing evidence of any fact to suggest that trial counsel had rendered ineffective assistance of counsel. In its detailed order denying relief, the court found, in pertinent part, as follows:

> [Mrs.] Collet[t] testified that [the victim] brought her a handgun for protection against [the petitioner]. She did not repeat anything that [the victim] had said, therefore the

testimony is not hearsay. The testimony was relevant to explain why there was a gun in the room and why Mrs. Collet[t] originally thought that [the victim] had accidentally shot himself with the gun. [The p]etitioner has failed to show trial counsel's performance was not reasonably effective on this issue or the outcome of the trial would have been different if the objection had been made[.]

. . . .

[The p]etitioner complains that counsel did not introduce the 911 recording as an exhibit at the trial or at the motion for new trial. A verbatim transcript of the recording was introduced at trial as substantive evidence. The issue was preserved for appeal and was addressed by the appellate court and found to be harmless error. The appellate court found that "Any distinction regarding admission of the transcript versus the actual tape is tedious at best." [*Roy Len Rogers*, slip op. at 35.] Any claims of ineffective assistance of counsel in a post-conviction petition that are identical to a petitioner's claims on direct appeal and determined by the appellate court not to rise to the level of plain error will also fail to establish prejudice in a post-conviction proceeding. . . . [The p]etitioner cannot meet his burden as to the prejudice prong of *Strickland*[ *v. Washington*]. Further, this issue was previously determined in favor of the State.

. . . .

[Ms.] Hawkins testified that [the p]etitioner had threatened her with a weapon. The testimony was nonresponsive to the State's question and very brief. An objection by the defense would have only served to bring more attention to the testimony. [Ms.] Hawkins was a biased witness and admitted on cross-examination that she hated [the p]etitioner. Trial counsel's decision not to object was a reasonable trial strategy and should not be "second guessed."

. . . .

- 11 -

[Ms.] Hawkins testified that [the p]etitioner had threatened [Ms.] Bennet[t]. This testimony came about on cross-examination by the defense and was nonresponsive to the question. The defense was able to show through cross-examination that Ms. Hawkins had no evidence of the alleged threats by [the p]etitioner. Trial counsel's decision not to object was a reasonable trial strategy and should not be "second guessed." . . . Even if trial counsel should have objected, the admission of this testimony did not change the outcome of the case under the standard of *Strickland*[.]

. . . .

Michael Gaither testified about [the p]etitioner's character. The decision by the defense to introduce [the p]etitioner's character for peacefulness was a reasonably based trial strategy. Several witnesses for the defense testified to [the p]etitioner's character as well. The State cross-examined Mr. Gaither only with matters already in the record. Trial counsel testified at the post-conviction hearing that [the p]etitioner had not informed him of his prior threats to Holly [Peak]. Trial counsel's decision to introduce character evidence was a reasonable trial strategy and should not be "second guessed."

. . . .

During his cross-examination of the State's rebuttal witness, trial counsel asked questions of Holly [Peak] which allowed her to testify that [the p]etitioner kept driving by her home and calling her house all of the time after she had broken up with him. Further questioning of Ms. [Peak] by trial counsel resulted in her testifying that she had obtained an Order of Protection against [the p]etitioner and that she did not fight [the p]etitioner for custody of her children because she was afraid for her two children.

Holly [Peak] testified regarding [the p]etitioner's character and [trial] counsel was obligated to challenge [Ms. Peak's] credibility. Counsel was able to elicit favorable testimony from her such as: [the p]etitioner committed no acts

of violence against her; [the p]etitioner only called or drove by; [the p]etitioner had her parental rights terminated; and [Ms. Peak] had a motive to be biased against [the p]etitioner. Trial counsel's cross-examination was a reasonable trial strategy and should not be "second-guessed." . . . Even if error, the admission of this testimony did not change the outcome of the case under the standard in *Strickland*[.]

. . . .

Trial counsel pursued a trial strategy of attempting to exclude the introduction of [Ms. Peak's] order of protection and any criminal charges against [the p]etitioner through pretrial motions. Trial counsel testified he did not want to open the door for the State to address these issues in front of the jury nor infer such conduct by [the p]etitioner from any questions on the subject. Counsel made a reasonably based trial strategy not to voir dire potential jurors regarding domestic violence.

. . . .

An address for the place to be searched is not required in a search warrant. The test of the legal sufficiency of a search warrant's description is whether or not it points to a definitely ascertainable place so as to exclude all others and enables an officer to locate the place to be searched with reasonable certainty. The description is sufficient if it informs the officer how to get there by direction. In rural areas, the description of the premises occupied by a named person is sufficient even though the property is incorrectly described. An incorrect description can also be overcome if the affiant is the same officer that executed the search warrant. Where the description in the affidavit is incorporated by reference in the warrant, the warrant is valid since the description is then a part of the search warrant. *O'Brien v. State*, 158 Tenn. 400, 14 S.W.2d 51 (1929).

The search warrant in this case states that the evidence is "on the premises of Len Rogers more particularly described in Exhibit "A" to the Affidavit and made a part of this

- 13 -

Warrant as if copied verbatim herein." The affidavit for search warrant states, "Len Rogers' residence is more particularly described in Exhibit "A" attached to and made part of this Affidavit as if copied verbatim herein." The description in Exhibit "A" leads to [the petitioner's] premises by direction, describes the driveway, describes the mobile home, describes the porch, and states the property is [the petitioner's] residence or is under his control. Investigator Chris Hall was the affiant in the search warrant and the officer that executed the search warrant. The [p]etitioner has not shown a motion to suppress regarding the description would have been successful and failing to file the motion would not have changed the outcome of this case under the standard in *Strickland*[.]

In this appeal, the petitioner reiterates his claim of ineffective assistance of counsel, claiming that trial counsel performed deficiently by failing to include in his motion to suppress the search warrant's lack of a particular description of the petitioner's property; failing to object to Mrs. Collett's testimony regarding the victim's reason for providing her with a firearm; failing to object to Ms. Hawkins' testimony regarding the petitioner's prior bad acts; opening the door to evidence of the petitioner's character for violence; failing to include the audio recording of the 9-1-1 call as part of the record on direct appeal; and failing to voir dire potential jurors on the issue of domestic violence. In addition, the petitioner contends that the cumulative effect of these errors prevented him from receiving a fair trial. The State contends that the court did not err by denying relief.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a

claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citing *Strickland*, 466 U.S. at 689), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

A claim of ineffective assistance of counsel is a mixed question of law and fact. *Kendrick*, 454 S.W.3d at 457; *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010); *State v. Honeycutt*, 54 S.W.3d 762, 766-67 (Tenn. 2001); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). When reviewing the application of law to the post-conviction court's factual findings, our review is de novo, and the post-conviction court's conclusions of law are given no presumption of correctness. *Kendrick*, 454 S.W.3d at 457; *Fields*, 40 S.W.3d at 457-58; *see also State v. England*, 19 S.W.3d 762, 766 (Tenn. 2000).

In our view, the record fully supports the denial of relief in this case. Trial counsel's reasoning for not objecting to Mrs. Collett's testimony about the victim's purpose in providing her with a handgun or to Ms. Hawkins' testimony about the petitioner's prior threats were "reasonably based trial strateg[ies]" that we will not "second-guess." *See Adkins*, 911 S.W.2d at 347. Likewise, trial counsel's decisions to introduce evidence of the petitioner's character for peacefulness and refrain from questioning potential jurors about domestic violence were reasonable trial strategies

employed after adequate trial preparation. *See id.*; *Cooper*, 847 S.W.2d at 528. With respect to the failure to include the 9-1-1 audio recording in the record on appeal, this court previously found that the failure to include the audio recording was harmless, *see Roy Len Rogers*, slip op. at 35, and thus, the petitioner cannot show that the failure to include the recording would have resulted in a different outcome. *Strickland*, 466 U.S. at 694. Additionally, the petitioner has failed to show how trial counsel's failure to seek suppression of the search warrant on the basis of an alleged insufficient description of the petitioner's property would have affected the outcome of his trial.

Given the overwhelming evidence against the petitioner, he cannot establish that, but for counsel's alleged errors, the outcome would have differed. *See Strickland*, 466 U.S. at 694. As such, we hold the petitioner has failed to prove by clear and convincing evidence any facts that demonstrate that trial counsel's representation was deficient or prejudicial. Finally, having considered the petitioner's issues on appeal and having concluded that he is not entitled to relief for any, we need not consider the cumulative effect of the alleged errors. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) ("To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed.").

The petitioner failed to establish that he was denied the effective assistance of counsel at trial. Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE